## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| **Enaebi Teibowei**, | Case No. |
| Plaintiff, | |
| v. | |
| **Trans Union, LLC**; **Equifax Information Services, LLC**; and **Experian Information Solutions, Inc.**, | |
| Defendants. | |

### COMPLAINT AND JURY DEMAND

Plaintiff Enaebi Teibowei brings this Complaint and Jury Demand against Defendants Trans Union, LLC; Equifax Information Services, LLC and Experian Information Solutions, Inc., and states the following allegations and claims for relief:

### INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it be used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should benefit from the resulting convenience and efficiency.

1

2.      Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated about them.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("**CRAs**").

4.      These CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers and similar interested parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage or employment or the like.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. 1681 et seq. (the "**FCRA**"),[1] federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers. The FCRA sets forth this and many other requirements for CRAs' operations.

---

[1] Unless otherwise specified all "**Section**" references are to the FCRA.

6.    This action seeks compensatory, statutory, and punitive damages, costs of suit and reasonable attorneys 'fees for the Plaintiff resulting from Defendants' failures to abide by the requirements of the FCRA as more fully described below.

**PARTIES**

7.    Plaintiff, Enaebi Teibowei, ("**Plaintiff**") resides in Bennington, Nebraska. Plaintiff is a consumer as defined by Section 1681a(c) of the FCRA.

8.    Defendant Trans Union, LLC ("**Trans Union**") is a foreign limited liability company organized under the laws of the state of Delaware, is licensed to do business in the state of Nebraska, regularly conducts business within said State, and has a registered office address located at The Prentice-Hall Corporation Systems Inc., Suite 1900, 233 South 13th Street, Lincoln, NE 68508. Defendant Trans Union is a "consumer credit reporting agency," as defined by 15 U.S.C. § 1681a(f), regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing "consumer reports," as defined by 15 U.S.C. § 1681a(d), to third parties.

9.    Defendant Experian Information Solutions, Inc. ("**Experian**") is a foreign corporation incorporated under the laws of the state of Ohio, is licensed to do business in the state of Nebraska, regularly conducts business within said State, and has a registered office address located at CT Corporation System, 5601 South 59th Street, Suite C, Lincoln, NE 68516. Defendant Experian is a "consumer credit reporting agency," as defined by 15 U.S.C. § 1681a(f), regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the

purpose of furnishing "consumer reports," as defined by 15 U.S.C. § 1681a(d), to third parties.

10.   Defendant Equifax Information Services, LLC ("**Equifax**") is a foreign limited liability company organized under the laws of the state of Georgia; is licensed to do business in the state of Nebraska, regularly conducts business within said State, and has a registered office address located at CSC-Lawyers Incorporation Service Company, Suite 1900, 233 South 13th Street, Lincoln, NE 68508. Defendant Equifax is a "consumer credit reporting agency," as defined by 15 U.S.C. § 1681a(f) regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing "consumer reports," as defined by 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION

11.   This lawsuit being brought pursuant to the FCRA presents a federal question and as such, jurisdiction arises under 28 U.S.C 1331 and 15 U.S.C 1681, *et seq.*

12.   Venue is proper within this district and division pursuant to 15 U.S.C. 1681p and 28 U.S.C. 1391(b). *Ford Motor Co. vs. Montana Eighth Judicial District Court,* 2021 WL 1132515 (U.S. March 25, 2021).

## FACTUAL ALLEGATIONS

### Summary of the Fair Credit Reporting Act

13.   The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

4

14.   The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information...."[2]

15.   The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[3]

## Processing of Credit Information

16.   The CRAs regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors and others.

17.   These sources are known as **"furnishers"** within the credit reporting industry and under the FCRA.

18.   The CRAs collect information from thousands of furnishers.

19.   The process by which the CRAs receives, sorts, and stores information is largely electronic.

---

[2] 15 U.S.C. 1681(b).
[3] 15 U.S.C. 1681e(b).

20.   Furnishers report credit information to the CRAs through the use of coded tapes that are transmitted to the CRAs on a monthly basis through software known as Metro 2.

21.   The CRAs take the credit information reported by furnishers and create consumer credit files.

22.   Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to as "tradelines" within the industry).

23.   The CRAs know that different consumers can have similar names.

24.   The CRAs know that different consumers can have similar social security numbers.

25.   The CRAs know that different consumers with similar names can also have similar social security numbers.

26.   The CRAs match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information the CRAs maintain about the consumer in the consumer's credit file or files.

27.   The CRAs accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

28.   Sometimes the CRAs matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

**The CRAs' Chronic Mixed File Problem**

29.   Mixed files are chronic inaccuracies at the CRAs and the CRAs have known about this problem for almost four decades.[4]

30.   Mixed files have been the subject of a regulatory enforcement action, attorney general investigations and of hundreds, if not thousands, of consumer complaints and litigation.[5]

31.   In the mid-1990's, the Federal Trade Commission and various state attorney generals' offices[6] charged the nationwide CRAs with violations of the FCRA.

32.   The government enforcement actions required the CRAs to improve their procedures and prevent mixed files.[7]

33.   The CRAs agreed to maintain reasonable procedures to avoid: (ii) including a consumer report information identifiable as pertaining to a consumer other than the consumer for whom a permissible purpose exists as to such report; and (iii) displaying files identifiable as pertaining to more than one consumer in response to

---

[4] *See e.g., Thompson v. San Antonio Retail Merchants Ass'n*, 682 F..22d 509 (5th Cir. 1982).

[5] *See e.g., Alabama v. Trans Union*, Civ. No. 92-C-7101 (N.D. Ill. Oct. 16, 1992) (Consent Order); *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996) (consumer reporting agency improperly mixed father's credit information into son's credit file).

[6] Including Alabama, Arkansas, California, Connecticut, Delaware, Florida, Idaho, Illinois, Louisiana, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Mexico, New York, Ohio, Pennsylvania, Rhode Island, Texas, Utah and Washington.

[7] *See FTC v. TRW, Inc.*, 784 F.Supp. 361 (N.D. Tex. 1991)(amended by N.D. Tex. Jan. 14, 1993) (agreed order amending consent order); *TRW, Inc. v. Morales*, CV-3-91-1340-H (N.D. Tex. Dec. 10, 1991); *In re Equifax Credit Information Services, Inc.*, (June 22, 1992); *In the Matter of Equifax Credit Information Services, Inc.*, 12 FTC 577 (Aug. 14, 1995); *In the Matter of Equifax Credit Information Services, Inc.*, 61 Fed. Reg. 15484 (Apr. 8, 1996); and *Alabama v. Trans Union, Corp.*, CV-92C7101 (N.D. Ill. Oct. 26, 1992).

a subscriber request on one consumer.

34.    Further, the CRAs agreed to prevent reporting to subscribers that credit information pertains to a particular consumer unless the CRA has identified such information by at least two of the following identifiers: (i) the consumer's name; (ii) the consumer's social security number; (iii) the consumer's date of birth; (iv) the consumer's account number with a subscriber or a similar identifier unique to the consumer.

35.    For public record information, in the event the public record information does not include at least two of the above - described personal attributes, Experian agreed to identify the public record information by the consumer's full name (including middle initial and suffix, if available) together with the consumer's full address.

36.    The CRAs have been defendants in mixed file related FCRA lawsuits for decades.[8]

37.    One of the earliest mixed file cases, *Thomas v. Trans Union*, resulted in a $1.3 million verdict against Trans Union in 2002.[9]

38.    In 2007, Angela Williams sued Equifax in Florida and alleged Equifax mixed her file with another consumer with a similar name. The jury found in favor of Angela Williams and entered a verdict against Equifax for over $2.9 million, including $219,000 in actual damages and $2.7 million in punitive damages.[10]

---

[8] Plaintiff's Complaint, ¶¶ 25-26. *See e.g.*, *Miller v. Equifax*, Case No. 3:11-cv-01231 (D. Or. 2013); *Williams v. Equifax*, Case No. 48-2003-CA-9035-0 (Orange Co., Fla. 2008); *Thomas v. Trans Union*, Case No. 3-00-01150 (D. Or. 2002); *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010) (Trans Union improperly mixed narcotic trafficker's OFAC criminal alert into innocent consumer's credit file).
[9] *Thomas v. Trans Union*, Case No. 3-00-01150 (D. Or. 2002).
[10] *Williams v. Equifax*, Case No. 48-2003-CA-9035-0 (Orange Co., Fla. 2008).

39.   In July of 2013, Judie Miller sued Equifax in Oregon and alleged that Equifax mixed her file with another consumer who had a different social security number, date of birth and address. The jury found in favor of Ms. Miller and entered a verdict against Equifax for over $18 million, including $180,000.00 in actual damages and $18.4 million in punitive damages.[11]

40.   The CRAs are aware of these verdicts.

41.   In 2012, New York Attorney General ("NYAG"), Eric T. Schneiderman launched an investigation into Experian, Trans Union, and Equifax after all three agencies were the subject of numerous complaints about errors on state residents' credit reports, including mixed files, and the onerous process to fix them.

42.   Part of the NYAG's focus was on the problem of mixed credit files.

43.   This three-year long investigation ultimately culminated in a Settlement agreement between the NYAG and the CRAs.[12]

44.   Through this investigation, the CRAs "produced a substantial volume of documents and information to the NYAG."[13]

45.   The NYAG and the CRAs also met on multiple occasions to discuss the concerns raised by the NYAG.[14]

46.   Among the concerns raised by the NYAG, were concerns about mixed files which

---

[11] *Miller v. Equifax*, Case No. 3:11-cv-01231 (D. Or. 2013).
[12] *In the Matter of Investigation by Eric T. Schneiderman of Experian, Equifax and Trans Union*, Settlement Agreement, dated March 8, 2015 (the "**NYAG Settlement Agreement**").
[13] NYAG Settlement Agreement, at 7.
[14] *Id*.

the NYAG Settlement Agreement describes as follows:

> Credit report errors generally arise due to incomplete or incorrect information provided by furnishers or consumers; fraud and identity theft; and, in some cases, through the CRAs' processes of matching information provided by furnishers to an individual consumer's credit files. For example, when consumers have similar names and share other identifying information such as an address, some or all of the credit information of one consumer can become "mixed" into the file of another consumer. Consumers may not be aware that their credit information has become mixed with another person's credit information.

> The CRAs employ sophisticated algorithms for matching the data submitted by furnishers to the credit files of individual consumers. The matching systems use various combinations of identifying information such as name, address, and social security number to match the credit data with an individual consumer's credit files. In order to take into account minor errors and omissions made by consumers and data furnishers, the matching systems do not require exact matches for all of the various identifying items. Thus, a CRA's matching system might, for example, match reported credit information to a particular consumer even where the reported social security number does not match all nine digits of the consumer's social security number, where several other identifying items are an exact match. The flexibility in the CRAs' matching system can benefit consumers by ensuring that positive credit information is not omitted from a consumer's file based on minor omissions or errors by the consumer or creditor in recording the consumer's identifying information. On the other hand, the flexibility in the matching system may, in certain circumstances, lead a CRA to erroneously assign the credit information of one person to another person's credit file, creating a "mixed file."[15]

47.   As explained further below, it was exactly these types of matching algorithms employed by the CRAs which caused Plaintiff's credit files to be mixed.

48.   While the CRAs denied any wrongdoing they agreed to make various changes to their practices.[16]

49.   Among other things, the CRAs, agreed to the following:

> The CRAs shall implement an automated process to share relevant information about consumers who dispute information contained in their credit reports when a

---

[15] NYAG Settlement Agreement, at 4-5.
[16] *Id*. at 7-8.

CRA confirms that a consumer's credit file information was mixed with that of another identified consumer (hereafter referred to as a "Confirmed Mixed File"). The CRAs shall develop and share best practices for sharing Confirmed Mixed File information among the CRAs, which shall include, but are not limited to, the following actions:

i.      Upon receipt of notice of a Confirmed Mixed File from another CRA, the receiving CRAs shall: (a) conduct a reasonable investigation into whether the disputed information is associated with the affected consumer in the CRA's credit database; and (b) take reasonable steps to avoid reporting any indicative information or tradelines deemed inaccurate because they belong to another identified consumer.

ii.     The CRAs shall analyze their shared data on Confirmed Mixed File information and other data concerning the manner of reporting tradelines and indicative information to determine other appropriate actions, if any, that should be taken to reduce the incidence of Confirmed Mixed Files.

iii.    The CRAs shall develop guidelines and procedures for communicating with consumers about mixed files and shall create educational content about mixed files generally, as part of the consumer education enhancements in Sections III.B.7.d and III.C.1.[17]

50.    As a result of the NYAG investigation and NYAG Settlement Agreement, on March 13, 2015, the CRAs, acting through their lobbyist, the Consumer Data Industry Association (the "**CDIA**"), issued a public statement concerning the reporting of public records, such as civil judgments and state and federal tax liens on consumer credit reports.[18]

51.    According to Attorney General Schneiderman: The pact "is a good sign that the reporting agencies are <u>finally</u> willing to step up their game and respond to the needs of hardworking consumers and their families." "Credit reports touch every part of

---

[17] NYAG Settlement Agreement, at 18-19.
[18] Statement Consumer Data Industry Association, dated March 13, 2017 (the "**CDIA Statement**").

our lives. They affect whether we can obtain a credit card, take out a college loan, rent an apartment, or buy a car – and sometimes even whether we can get jobs." "The nation's largest reporting agencies have a responsibility to investigate and correct errors on consumers' credit reports. This agreement will reform the entire industry and provide vital protections for millions of consumers across the country," Schneiderman said. [19]

52. According to the CRAs' lobbyist, Stuart Pratt of the CDIA: "This dialogue with a state attorney general [gave] us the chance to have a dialogue with each other and work on details on how we can proactively pursue changes to our practices."[20]

53. There are many different possible causes for the merging of credit files but all of them relate in one way or another to the algorithms (the database rules) used by the CRAs to match credit information to a particular consumer's credit file.

54. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to the CRAs.

55. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal or "indicative"

---

[19] *Credit-reporting agencies agree to overhaul*, http://www.reuters.com/article/usa-creditreporting/credit-reporting-agencies-agree-to-overhaul-idUSL4N0WB23Z20150309, last viewed on October 2, 2017.

[20] *Credit reporting agencies unite to transform reporting and resolution practices*, https://www.lexology.com/library/detail.aspx?g=cfe25111-0ed7-4fb3-8878-76b73863c033, last viewed on October 2, 2017.

information (e.g., name, social security number, address, date of birth, etc.) by the furnishers to the CRAs.

56.   These rules also determine which credit files are merged to create a complete consumer report.

57.   Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

58.   Despite the CRAs' long-standing and specific knowledge of a mixed file problem Plaintiff's credit report still was generated by the CRAs containing information belong to another consumer.

<strong>Reinvestigation Procedures</strong>

59.   When the CRAs receive a dispute from a consumer, the CRAs investigate the dispute using an automated browser-based system called the Online Solution for Complete and Accurate Reporting ("**e-OSCAR**"). This system was designed to provide furnishers with an online solution for processing consumer disputes.

60.   Through e-OSCAR, the CRAs send to the furnisher an Automated Credit Dispute Verification ("**ACDV**") which is supposed to include: the information the agency is currently reporting about the consumer and the credit information being disputed along with all relevant information about the consumer's dispute which the agency received from the consumer.

61.   Through this ACDV, the CRAs ask the furnisher to investigate the information in question and determine whether the information that it is reporting to the agency is correct, complete, and verifiable.

62.   Through the ACDV, the furnisher is asked to verify that the indicative information (i.e. information such as name, current address, prior address, social security number, date of birth and phone number) the CRAs have on the consumer matches the indicative information maintained in the furnisher's records; to verify that it is associated with the particular account being disputed; and to verify the accuracy of the tradeline information.

63.   The furnisher is then supposed to return the ACDV to the CRAs with the updated information (if any) relating to the consumer's credit history. In responding to an ACDV, a furnisher informs the agency that: (a) either the disputed information is "Verified"; (b) that the disputed information should be "Changed"; (c) or that the disputed item of information should be "Deleted." To do this the furnisher is asked to do nothing more than check a box.

64.   If a furnisher chooses to verify the information, it will check a box called "Verified As Reported." Once checked, this will instruct the consumer reporting agency that all information about the disputed item of information is, in fact, accurate and that no changes should be made.

65.   If a furnisher chooses to change information, it will check a box called "Change Data As Shown" and then will input changes into the various fields of information that need to be changed.

14

66.  Whenever a furnisher directs an agency to change information on a consumer's credit file, that furnisher affirms to the CRAs that it has made the same changes in its own systems. This affirmation is made by the furnisher on the form used to process the dispute.

### Plaintiff's Credit File and Consumer Reports

67.  Plaintiff takes great pride in his good name and credit record and works very hard to ensure that his bills are paid in full and on time every month.

68.  Sometime prior to June 2021, the CRAs began matching tradelines to Plaintiff's credit file which did not belong to him, including, but not limited to Capital One Auto Finance, Capital Bank, TXU Energy, IQ Data, United Revenue Corp, and Fed Loan Servicing (collectively, the "**Accounts**").

69.  Plaintiff is not and has never been a party to these Accounts and has no liability on any of them.

70.  Plaintiff has disputed the accuracy of these Accounts with the CRAs. In his disputes, Plaintiff explained that the Accounts do not belong to him.

71.  The CRAs sent the results of their reinvestigations to Plaintiff which informed Plaintiff that the CRAs did not delete the Accounts from Plaintiff's credit file.

72.  Plaintiff's CRAs credit files contain or have contained information that did not belong or pertain to him.

73.  Plaintiff's CRAs credit file also included inaccurate personal or indicative information.

74.   Plaintiff's credit files have been merged by the CRAs with the credit file or files of at least one other consumer or the CRAs have inaccurately mixed information from at least one other consumer's credit file with Plaintiff's credit files.

75.   The CRAs' merging and matching algorithms have caused Plaintiff's credit files to be mixed with credit information and/or credit files belonging to someone other than Plaintiff.

76.   Within the two years before the filing of this Complaint, the CRAs prepared and distributed one or more consumer reports, as the term is defined by Section 1681a(d), pertaining to Plaintiff that contained misleading or inaccurate information which belonged to another consumer.

77.   The CRAs failed to maintain reasonable procedures to prevent Plaintiff's credit information and/or credit files from being mixed with the credit information and/or credit files of at least one other consumer.

78.   The CRAs know that their databases mix credit information and credit files that should not be mixed.

79.   The CRAs have been sued by consumers and suffered judgments as a result of mixing consumer credit information and/or credit files.

80.   When the CRAs assemble consumer reports for their subscribers, they allow these subscribers to use only a partial list of personal identifiers to match data to the target consumer resulting in the inclusion of a broad range of credit information; information which may in some cases belong to another consumer.

81.   The CRAs also fail to require an exact match of all digits of a consumer's social security number which may in some cases result in the inclusion of credit information which belongs to another consumer.

82.   However, when consumers, like Plaintiff, request copies of their credit files, the CRAs requires a complete match of all personal identifiers, resulting in a narrower match of data for the consumer.

83.   Consequently, the CRAs' own procedures for disclosing information to consumers (as they are required to do by the FCRA) tends to mask or conceal the problem of mixed files.

84.   By concealing this information, the CRAs impair the ability of consumers, like Plaintiff, to identify and dispute errors resulting from mixed credit information or credit files.

85.   The CRAs have failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit file and of his consumer reports.

86.   The CRAs' failures to follow reasonable procedures are reckless and/or willful.

87.   Within the last two years Plaintiff has requested a copy of his credit files and did not receive all of his credit files or all of the information contained in his CRA credit files.

88.   Within the last two years Plaintiff has requested a copy of his credit files and did not receive all of his credit files or all of the information which the CRAs included in credit reports it prepared and sold using Plaintiff's credit files.

17

89.  Within the last two years Plaintiff has applied for credit and those applications resulted in the CRAs creating and providing consumer reports about Plaintiff to Plaintiff's potential creditors or to resellers that in turn provided the information to Plaintiff's potential creditors. The information contained within those reports included information related to consumers other than Plaintiff and information which was not disclosed to Plaintiff when he requested a copy of his credit files.

90.  A consumer's right to dispute information contained in a consumer report is an important safeguard necessary to ensure accuracy. The legislative history of the FCRA rightly characterizes the dispute and correction process as "the heart of ... efforts to ensure the ultimate accuracy of consumer report."

91.  Within the two years before the filing of this Complaint, the CRAs prepared and distributed one or more consumer reports, as the term is defined by Section 1681a(d) of the FCRA, pertaining to Plaintiff that contained misleading, incomplete and/or inaccurate information tradelines belonging to other consumers.

92.  Within the two years before the filing of this Complaint, Plaintiff has been denied credit, credit opportunity and/or had other adverse action taken against him as a result of the CRAs preparing consumer reports about Plaintiff which include the Account and other erroneous information.

93.  Each of these adverse actions and others cause Plaintiff considerable emotional distress, including frustration, loss of sleep, headaches, nausea, embarrassment, and humiliation.

94.  The CRAs have failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit file and of his consumer reports.

95.  The failures of the CRAs to follow reasonable procedures are negligent and/or willful.

96.  Upon information and belief, the CRAs processed Plaintiff's disputes by sending ACDVs to the furnishers of the Accounts.

97.  Upon information and belief, the furnishers received and responded to those ACDVs.

98.  Other than sending an ACDVs to the furnishers, the CRAs did nothing to investigate whether or not Plaintiff was in fact liable for the Account.

99.  Plaintiff spent time disputing the inaccurate reporting with the CRAs which constitutes out of pocket loss of his valuable time in an amount not less than $2500.

100.  The failures of the CRAs to correct this reporting has caused Plaintiff a great amount of anxiety, has impaired his ability to obtain credit or to obtain it on favorable terms.

**CLAIMS FOR RELIEF**

**FCRA Violations by Trans Union**

101.  The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[21]

---

[21] *See* 15 U.S.C. 1681e(b).

102. Trans Union has actual knowledge, by and through numerous other consumer lawsuits, thousands of complaints filed with the Better Business Bureau ("BBB"), actions by the FTC and numerous state attorney generals, including Ohio, and through its own agreement following the NYAG Investigation to correct the procedures which caused Plaintiff's credit file to be mixed those problems exist with matching criteria causing unrelated consumer files to merge.

103. Despite its actual knowledge of an ongoing and chronic mixed file problem, Trans Union merged Plaintiff's credit file with the credit file of another individual. Trans Union's matching criteria caused Plaintiff, a consumer with excellent credit, to be slandered, harmed, and humiliated by being strapped with a defaulted loan thereby damaging his credit reputation and ability to acquire credit at the best terms available.

104. Trans Union maintained sufficient information to conclude that certain tradelines and identifying information did not belong to Plaintiff and, therefore, should not be mixed with Plaintiff's credit file. Trans Union did not maintain sufficient information to conclude that the Accounts actually belonged to Plaintiff but mixed that information into Plaintiff's credit files, nonetheless.

105. Trans Union has failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit file and Plaintiff's consumer reports.

106. Trans Union has failed to properly investigate Plaintiff's disputes on at least one occasion.

20

107. Trans Union has failed to disclose the complete contents of Plaintiff's credit file(s) to Plaintiff.

108. Trans Union has failed to provide Plaintiff with the information contained in his Trans Union credit file(s).

109. Plaintiff has suffered damages, including the denial or inability to obtain credit and various forms of emotional distress, including frustration, confusion, anger, depression, and a general feeling of helplessness, as a result of the actions and inaction of Trans Union.

110. Plaintiff's actual damages include both pecuniary and non-pecuniary damages.

111. Plaintiff has been denied credit, has suffered financial loss, delay in obtaining approval for a credit, loss of credit opportunity, out-of-pocket expenses and time expended in disputing errors.

112. Plaintiff has suffered emotional distress, pain and suffering or humiliation, loss of sleep, nervousness, frustration, mental anguish over credit report, injury to his reputation, and injury to sense of wellbeing.

113. Others can corroborate the emotional distress suffered by Plaintiff.

114. Trans Union's failure to prevent mixed credit files of the type described herein (along with other FCRA violations) caused and continues to cause Plaintiff emotional distress, impaired Plaintiff's ability to obtain credit and has damages his credit scores.

115. Plaintiff has also spent time attempting to educate himself about these issues and attempting to have Trans Union's inaccurate reporting corrected.

116. It distressed Plaintiff to learn that Trans Union had mixed his credit data with derogatory credit data belonging to another consumer.

117. It distressed Plaintiff to know that his credit reputation had been harmed and that she risked possible future embarrassment when seeking credit.

118. It distressed Plaintiff to know that his creditors (who view his credit history on a regular basis to make decisions about new credit or more favorable terms on existing credit) and potential creditors who might offer his credit would have seen this inaccurate information and incorrectly concluded that he was not credit worthy.

119. Trans Union has negligently violated Section 1681e; alternatively, Trans Union has willfully violated Section 1681e.

120. Trans Union has negligently violated Section 1681i; alternatively, Trans Union has willfully violated Section 1681i.

121. Trans Union has negligently violated Section 1681g; alternatively, Trans Union has willfully violated Section 1681g.

122. Plaintiff has suffered damages as a result of these violations for which Plaintiff is entitled to recover under Section 1681o or, alternatively, Section 1681n.

### FCRA Violations by Equifax

123. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible

accuracy of the information concerning the individual about whom the report relates."[22]

124.   Equifax has actual knowledge, by and through numerous other consumer lawsuits, thousands of complaints filed with the Better Business Bureau ("BBB"), actions by the FTC and numerous state attorney generals, including Ohio, and through its own agreement following the NYAG Investigation to correct the procedures which caused Plaintiff's credit file to be mixed those problems exist with matching criteria causing unrelated consumer files to merge.

125.   Despite its actual knowledge of an ongoing and chronic mixed file problem, Experian merged Plaintiff's credit file with the credit file of another individual. Equifax's matching criteria caused Plaintiff, a consumer with excellent credit, to be slandered, harmed, and humiliated by being strapped with a defaulted loan thereby damaging his credit reputation and ability to acquire credit at the best terms available.

126.   Equifax maintained sufficient information to conclude that certain tradelines and identifying information did not belong to Plaintiff and, therefore, should not be mixed with Plaintiff's credit file. Equifax did not maintain sufficient information to conclude that the Accounts belonged to Plaintiff but mixed that information into Plaintiff's credit files, nonetheless.

---

[22] *See* 15 U.S.C. 1681e(b).

127.   Equifax has failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit file and Plaintiff's consumer reports.

128.   Equifax has failed to properly investigate Plaintiff's disputes on at least one occasion.

129.   Equifax has failed to disclose the complete contents of Plaintiff's credit file(s) to Plaintiff.

130.   Equifax has failed to provide Plaintiff with the information contained in his Equifax credit file(s).

131.   Plaintiff has suffered damages, including the denial or inability to obtain credit and various forms of emotional distress, including frustration, confusion, anger, depression, and a general feeling of helplessness, as a result of the actions and inaction of Equifax.

132.   Plaintiff's actual damages include both pecuniary and non-pecuniary damages.

133.   Plaintiff has been denied credit, has suffered financial loss, delay in obtaining approval for a credit, loss of credit opportunity, out-of-pocket expenses and time expended in disputing errors.

134.   Plaintiff has suffered emotional distress, pain and suffering or humiliation, loss of sleep, nervousness, frustration, mental anguish over credit report, injury to his reputation, and injury to sense of wellbeing.

135.   Others can corroborate the emotional distress suffered by Plaintiff.

136.   Equifax's failure to prevent mixed credit files of the type described herein (along with other FCRA violations) caused and continues to cause Plaintiff emotional

distress, impaired Plaintiff's ability to obtain credit and has damages his credit scores.

137. Plaintiff has also spent time attempting to educate himself about these issues and attempting to have Equifax's inaccurate reporting corrected.

138. It distressed Plaintiff to learn that Equifax had mixed his credit data with derogatory credit data belonging to another consumer.

139. It distressed Plaintiff to know that his credit reputation had been harmed and that she risked possible future embarrassment when seeking credit.

140. It distressed Plaintiff to know that his creditors (who view his credit history on a regular basis to make decisions about new credit or more favorable terms on existing credit) and potential creditors who might offer his credit would have seen this inaccurate information and incorrectly concluded that he was not credit worthy.

141. Equifax has negligently violated Section 1681e; alternatively, Equifax has willfully violated Section 1681e.

142. Equifax has negligently violated Section 1681i; alternatively, Equifax has willfully violated Section 1681i.

143. Equifax has negligently violated Section 1681g; alternatively, Equifax has willfully violated Section 1681g.

144. Plaintiff has suffered damages as a result of these violations for which Plaintiff is entitled to recover under Section 1681o or, alternatively, Section 1681n.

**FCRA Violations by Experian**

145.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[23]

146.    Experian has actual knowledge, by and through numerous other consumer lawsuits, thousands of complaints filed with the Better Business Bureau ("BBB"), actions by the FTC and numerous state attorney generals, including Ohio, and through its own agreement following the NYAG Investigation to correct the procedures which caused Plaintiff's credit file to be mixed those problems exist with matching criteria causing unrelated consumer files to merge.

147.    Despite its actual knowledge of an ongoing and chronic mixed file problem, Experian merged Plaintiff's credit file with the credit file of another individual. Experian's matching criteria caused Plaintiff, a consumer with excellent credit, to be slandered, harmed, and humiliated by being strapped with a defaulted loan thereby damaging his credit reputation and ability to acquire credit at the best terms available.

148.    Experian maintained sufficient information to conclude that certain tradelines and identifying information did not belong to Plaintiff and, therefore, should not be mixed with Plaintiff's credit file. Experian did not maintain sufficient information

---

[23] *See* 15 U.S.C. 1681e(b).

to conclude that the Flagstar Account actually belonged to Plaintiff but mixed that information into Plaintiff's credit files, nonetheless.

149.  Experian has failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit file and Plaintiff's consumer reports.

150.  Experian has failed to properly investigate Plaintiff's disputes on at least one occasion.

151.  Experian has failed to disclose the complete contents of Plaintiff's credit file(s) to Plaintiff.

152.  Experian has failed to provide Plaintiff with the information contained in his Experian credit file(s).

153.  Plaintiff has suffered damages, including the denial or inability to obtain credit and various forms of emotional distress, including frustration, confusion, anger, depression, and a general feeling of helplessness, as a result of the actions and inaction of Experian.

154.  Plaintiff's actual damages include both pecuniary and non-pecuniary damages.

155.  Plaintiff has been denied credit, has suffered financial loss, delay in obtaining approval for a credit, loss of credit opportunity, out-of-pocket expenses and time expended in disputing errors.

156.  Plaintiff has suffered emotional distress, pain and suffering or humiliation, loss of sleep, nervousness, frustration, mental anguish over credit report, injury to his reputation, and injury to sense of wellbeing.

157.  Others can corroborate the emotional distress suffered by Plaintiff.

158.   Experian's failure to prevent mixed credit files of the type described herein (along with other FCRA violations) caused and continues to cause Plaintiff emotional distress, impaired Plaintiff's ability to obtain credit and has damages his credit scores.

159.   Plaintiff has also spent time attempting to educate himself about these issues and attempting to have Experian's inaccurate reporting corrected.

160.   It distressed Plaintiff to learn that Experian had mixed his credit data with derogatory credit data belonging to another consumer.

161.   It distressed Plaintiff to know that his credit reputation had been harmed and that she risked possible future embarrassment when seeking credit.

162.   It distressed Plaintiff to know that his creditors (who view his credit history on a regular basis to make decisions about new credit or more favorable terms on existing credit) and potential creditors who might offer his credit would have seen this inaccurate information and incorrectly concluded that he was not credit worthy.

163.   Experian has negligently violated Section 1681e; alternatively, Experian has willfully violated Section 1681e.

164.   Experian has negligently violated Section 1681i; alternatively, Experian has willfully violated Section 1681i.

165.   Experian has negligently violated Section 1681g; alternatively, Experian has willfully violated Section 1681g.

166.   Plaintiff has suffered damages as a result of these violations for which Plaintiff is entitled to recover under Section 1681o or, alternatively, Section 1681n.

**JURY DEMAND**

Plaintiff demands trial by jury.

**REQUEST FOR RELIEF**

Plaintiff respectfully requests that the Court grant any and all of the following relief:

(a) actual damages; (b) statutory damages in an amount to be determined at trial; (c)

punitive damages in an amount to be determined at trial; (d) costs and attorney fees; and

(e) any other relief the Court deems just and proper.

Dated this 8th day of April, 2022.

Respectfully submitted,

_/s/ Sam King_
Sam King, Esq.
NE #19442
PATINO KING, L.L.C.
12020 Shamrock Plaza, #200
Omaha, NE 68154
Telephone (402) 401-4410
Sam@PatinoKing.com

Thomas J. Lyons, Jr., Esq.
Attorney I.D. #: 249646
CONSUMER JUSTICE CENTER, P.A.
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Facsimile:  (651) 704-0907
tommy@consumerjusticecenter.com
(_Pro Hac Vice Motion Forthcoming_)

***ATTORNEYS FOR PLAINTIFF***